No? You're reserving four minutes? Yes, Your Honor. May it please the court, Mark Holland on behalf of appellant Eric Resch. Mr. Resch and his wife, Janelle Gonzalez Resch, are here in the audience with us today. In addition to the materials in our brief, I would like to... It's a rhetorical question, but you understand what I'm saying. I'm sorry, Your Honor. The material I was going to present today, I believe, may address your concern. All right. The chronology of this industry and the evidence that is in the record shows that this was a sleepy industry that had not had significant developments in this particular technology for decades. The appellees themselves point out that one of their references, the Purity Super Scoop that they tried to use as a 102 reference, had been in existence for more than 20 years prior to Mr. Resch inventing his technology. We have a picture of that in our reply brief at the top of page 24, the shape of that cross section, as it existed in 1971. In 1982, the third party, Chris Collins, filed his application that became a 117 patent. That was more than 10 years before Mr. Resch filed his application. In 1989, Purity modified its Super Scoop design, as shown again on that same page. We have a sequence of photos showing the different designs of that Super Scoop. In 1989, they changed their design. The relevance of those three designs is that none of them showed that people appreciated the problem that Mr. Resch came to appreciate. By coincidence, 1989, when Super Scoop made its change in design, was the year that Mr. Resch became involved in the industry. He started cleaning pools for a living. As he was cleaning pools and using these tools, including the Super Scoop and including the Collins products, the BR-18 that's in the record that was in the patent that he filed, he realized what apparently nobody in this sleepy industry realized, that there was a problem. These tools did not, in fact, allow the debris to be scooped easily into the net. As you normally move the tool through the swimming pool, it presented a flat face that actually blocked flow of the debris into the net. All of these products, the 1971 version of the Super Scoop, the 1982 product that became the 117 patent, and the BR-18 product that was cited by the district court, and the 1989 version of the Purity Super Scoop had that same problem. When you say that as you normally use the product, I'm not familiar with these devices, so help me out here. Would you normally be pushing this device to scrape up the leads or pulling the device to scrape up the leads? Do you understand what I'm asking? I do. The normal use that we're talking about is a pushing motion. Right. That's why the device that Mr. Resch invented is shaped the way it is. I stand on the side of the pool, and I push toward the middle of the pool to try to collect the leads. Yes. The pole is like this, and the net and scoop are down here, right? Right. All right. Why isn't the art that contains slanted, something like collars I guess it is, that contains a slanted, seemingly smooth in the usual sense of the word, surface, why isn't that exactly what you've invented? Well, we included drawings to illustrate that. I know. I didn't find the drawings were, I wasn't able to get a sense of exactly what you were saying about why that Collins device doesn't work. Assuming I'm pushing the device at an angle, and the net is here, and the front of the device is here, it seems like the Collins would work. Why doesn't it? Okay. Let me move from one extreme to another. If you were pushing the Collins device horizontally, it would be in effect like a dustpan. Right. Okay. But you don't push it horizontally, because that would be the top of the water. You stand above the top of the water, and so to push that tool horizontally, you'd be six feet up above the water. I guess it depends on whether there's a pivot on the device around where the net is. There's no pivot. It's a pole, so it's a straight pole that reaches down, and I lower the entire pole as shown in the drawings that we presented. And so as I put it down, not just to the water level, but further down into the water to the bottom of the pool where the debris is that I need to pick up. And so the angle of Collins gets steeper. Yes, and in a normal stroke, Collins becomes a vertical face or even more, depending on where you are in the pool. But that gets us to the question of claim construction, and this is where I started having trouble. If the claim construction, the key word is smooth, it's hard for me to see why Collins is not smooth. It has a slanted surface that doesn't seem to have any breaks in it. Now admittedly, something that is being held up like that, as you say, looks like it wants to have something that's curved down at a steeper angle, maybe even curving up a little bit so that you can scoop like this. But why is that? Why is Collins not smooth in the terms used in the patent? Well, the claim construction, I'm not certain that it is applicable to the issue that we're discussing here. Well, it's pretty important because that's what the whole invalidity question turns on. There's not a question of whether that surface is smooth. It's a question of whether it is relevant to Claims 1 and Claim 8 to make them invalid. Claims 1 and Claim 8, as we said in pages 1 through 7 of our reply brief in significant detail, have this requirement of the normal movement through the pool. And the district court erred in saying exactly the opposite. The district court erred in the reply brief, Your Honor, 1 to 7. I know. I'm just looking for the patent. I'm sorry. Yeah. The district court held that there was no requirement of any orientation or relationship of that surface. And it is in both Claims 1 and 8 as the independent claims and therefore in all the dependent claims. Let me turn you to your unfelt need claim. You rely heavily on a declaration of Ms. Rush. But the relevant paragraphs of that declaration say things like hundreds of people told me how useful this device was. Or there were lines around the building to buy it. But there's no foundation of any sort for any of that testimony. There's no time, there's no place, there's no names or identification of participants. You need all that stuff in order to have a competent affidavit, do you not? Yes, Your Honor. In the context of the motion that we were presented with and the time that was present and it was summary judgment, we put together the best information that we could. So you put together an incompetent affidavit, in other words. I would argue that in the circumstances that... Well, it either is or it isn't. You're the judge. Yeah, that's true. If you judge it as incompetent, then that's your judgment. You're not arguing that there's any foundational basis for the testimony, is there? To that level of detail, I believe it was in the... Any level of detail. Your Honor, there is one compelling fact beyond... There are at least two more facts that I wanted to make sure and talk about today with you. The Australian patent that is the only new piece of evidence that was not before the patent examiner that the district court relied upon as saying that it also showed what the Collins 117 patent showed is actually not as material as the 117 patent. The Australian patent has a frame member that has a slope surface on it. Instead, the Resch device is a separate member that clips onto a frame member and the separate member is where the slope element occurs. The Australian patent does not have a U-shaped element that can be clipped onto a frame. Instead, the net of the Australian patent is connected to that sloped frame by screws from underneath. For all those reasons, the Australian patent is not as relevant. But it does indicate one thing in terms of non-obviousness. It was filed slightly more than a year before Mr. Resch filed and it shows basically the same functional structure that Judge Bryson was inquiring about. The same front shape like the 117 Collins patent. It has that same orientation so that as you push down to the bottom of the pool, you're going to end up with that vertical face where the debris can't go into the net. What that indicates is that, again, over these decades leading up to Mr. Resch's invention, the Purity Company, the Collins development, and now the Australian filing, none of them appreciated that they needed to address that and fix that. They were all apparently unaware of that problem. This is relevant to KSR analysis because KSR says that a patent's subject matter can be proved obvious by noting that there existed at the time of invention a known problem. Well, this problem was not known. It had been in the industry for decades until Mr. Resch got there using these decades-old tools. You know you're under your rebuttal time. Thank you, Your Honor. I will make one last point. Perhaps the most damning evidence to show that this is not an obvious invention is that the appellees, shortly after Mr. Resch brought his product to market, made an offer to buy the patent and to buy his business. That, to me, is tantamount to admission that because they had been in the industry, they knew the products, they knew these decades-old designs that had been out there, they looked at his new product and they recognized that it was new and it was different and it was worth buying, they made that offer to him. Thank you, Your Honor. May it please the Court. Joshua Stoll on behalf of the appellee. In this case, this Court should affirm the District Court's finding of obviousness of the asserted claims. The issue before the District Court was whether a person of ordinary skill in the art would find it obvious to modify the plastic rim that's clipped on the front of the BR-18 physical rake to have a smooth surface like shown in the Australian patent or in the Collins patent. That was the question that the District Court was addressing. Mr. Resch had admitted that the BR-18 included every claim limitation except the smooth surface, and that's in the record at 2054 to 2055. Orrick had presented evidence that a person of skill in the art would have found it obvious to modify the front surface of the BR-18 to have a smooth surface. There were no manufacturing hurdles in the industry to doing that. Plastic extrusions are very easy to make, very cheap to make, and so there was expert testimony that a person of ordinary skill in the art would have found it obvious to modify that shape to be really any shape that you want, including a smooth shape. Mr. Resch and his experts did not offer any sort of rebuttal to that evidence. The only basis for which Mr. Resch argued non-obviousness at the District Court was that there was a presumption of validity, and so there's no factual evidence that a person of ordinary skill in the art would not have known how to modify the extrusion to have a smooth front surface. In terms of the orientation of the rake that's been argued here, first off, the panel recognized that there's no evidence of the record regarding the orientation of Collins or the Australian patent in Resch's brief at 14 to 17 and 47 to 51 where he discusses this. There's no evidence cited to support the contentions about how the device would tilt when it's used in the water. Similarly, at the reply brief at pages 1 through 7, there's no evidence supporting these contentions about how Collins would be tilted if it were used in a… I asked, counsel, I meant, even though it was a rhetorical question, I meant that it was Ipsit-Dixon. Thank you, Your Honor. There's a reason for that. In fact, there is evidence in the record that the prior art references do satisfy those claims. The Australian patent is a good example. Figure 3A shows the device moving through the water, and there's a flow pattern shown going over the front of the Australian rake. During his deposition, Mr. Resch admitted that that accurately reflected how the water would flow over the front surface of the rake as it was moved through the water, and that's at appendix 1455 to 1456. So, the evidence in the record is that the rakes do direct debris as required in the patent as they're moved through the water. Also, again, there's no dispute that the BR-18 meets that limitation. So, our primary reference here meets all the limitations in the patent except the smooth surface, and the smooth surface has been found not only in the pool arts, but there are a number of other arts such as dust pans, snow shovels, pooper scoopers where smooth surfaces were used for scooping debris. Can I ask you about the judgment? I just want to clear this up. Sure. Do you agree that it only invalidates claims 1 and 8? It doesn't invalidate the entire patent? It invalidates the asserted claims in the case, so that would be 1, 2, and 6 through 8. But not the entire patent? That's correct. So, that last sentence that calls the patent invalid has to be read in context. Honestly, I just want to make sure. I mean, assuming we agree with you, we don't need to remand to have the judgment corrected to make it clear. But you agree that it doesn't invalidate the entire patent? That's correct. Dependent claims 3, 4, and 5 were not asserted in the case, and we agree with you that those are not invalid. In terms of the secondary considerations, there was... Sorry, Your Honor. They were not invalidated. You may think they're invalid, but... Right, right. Sorry, Your Honor. In terms of the secondary considerations... Claim 9, I guess, is the other one. What's that? Claim 9. That's correct. Claim 9, Your Honor. In terms of the secondary considerations, again, there was never any nexus established between the secondary considerations that were alleged in this case and the allegedly novel smooth scooping surface. As alleged earlier, and as the district court noted, it was really kind of hearsay and anecdotal testimony that lots of people had expressed an interest over the rakes. However, the inventor himself... It wasn't alleged, Mr. Stowell. It was noted. It was noted. Thank you. In terms of the actual reasons for the sale, the inventor himself admitted there were a number of reasons that the rakes sold. They were rugged and durable. This is in the declaration submitted in opposition to the summary judgment of invalidity. Also, customer service, coloring, a lot of different reasons that the rakes sold beyond the smooth surface. In fact, there was no evidence of record that the smooth surface had any impact on the sales. There's also a claim construction issue raised and also this issue of alleged false evidence. My opponent didn't discuss those, and so I'll rest unless you have any questions on those particular issues. Thank you for the time. Mr. Holland, you have a couple minutes left there. Thank you, Your Honor. I want to come back to the KSR standard that should control here and the history that I recited of the prior art and the actions by appellee that this technology, these tools that had been in place, had been there for decades, and nobody had identified this problem until Mr. Resch got into the industry and he was frustrated with that old technology. The last point I made earlier, as soon as he introduced it, the appellees came and asked if they could buy his company and buy his patent. That's what would have happened for a person of ordinary skill in the art. This was new. This was different. That reaction by the appellees should carry, almost independently of everything else, should carry the question of obviousness and allow us to go to trial. Is there anything in the record as to how much was offered for the company and the patent? I don't recall if it is in the record. It would seem to me that that might be very important in distinguishing between a case in which one was really quite concerned that the patent might have great force as opposed to a case in which the patent can be eliminated simply for nuisance value. Well, there was no question of infringement at that time. They had their own prior art, old dusty design that they were selling and they were excited about whatever the price was. But it would be expensive to have a patent fight over validity and maybe they offered to buy the company in order to avoid that expense. But this was 20 years ago, Your Honor. This was when he first came out. There was nothing else like it on the market. But he had a patent. He had a patent pending. He may have had a patent at the point in time of the offer, but the point is it was very early and he hadn't built the company up and he hadn't generated the sales yet. But when they saw it, because they were at the trade shows right beside him and they were that excited that they made that offer. The KSR standard about the problem being a known problem I don't think is met here and so we're an exception to that. And also, Pelley's brief where they say there was no known design need or market pressure. People were happy with the old product that had the problem. Mr. Resch came in and he was not happy. He's the one that saw the problem, made the design, and fixed it. Thank you, Your Honor. Thank you, counsel.